UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA L. PACE,

                Plaintiff,                        CASE NO.:2:06-CV-15058

vs.                                    HONORABLE AVERN COHN
MICHAEL J. ASTRUE                   HONORABLE STEVEN D. PEPE
COMMISSIONER OF SOCIAL SECURITY,
                Defendant.

_____/

## Report and Recommendation

**1.**     **BACKGROUND**

        Plaintiff, Linda Pace, brought this action under 42 U.S.C. §405(g) to challenge a final

decision of the Commissioner finding that Plaintiff was not entitled to Disability Insurance

Benefits (DIB) under Title II of the Social Security Act.  Plaintiff filed a motion to remand the

administrative law judge's decision due to a lack of procedural due process.  Defendant filed a

motion for summary judgment.  Both motions have been referred to the undersigned pursuant to

28 U.S.C. § 636(b)(1)(B) and (C).  For the following reasons, **IT IS RECOMMENDED** that the

Commissioner's motion for summary judgement be **DENIED** and Plaintiff's motion for summary

judgment be **GRANTED IN PART** and  this matter be remanded for further proceedings so the ALJ

can incorporate the findings required by 20 C.F.R. §404.1520a into his opinion and that

Plaintiff's counsel be given an opportunity to comment on and submit and counter evidence

regarding the post-hearing psychiatric examination of March 6, 2006, prior to any final ALJ

decision

 **A.**     **Procedural History**

Plaintiff filed an application for disability benefits[1] on February 4, 2003, indicating a disabling condition beginning on August 16, 2000 (R. 78). This was denied July 25, 2003 (R. 52). She reapplied and also requested a hearing on September 19, 2003 (R. 57, 81). Plaintiff received an Order of Dismissal on April 27, 2005, based on a failure to appear at the hearing. Plaintiff appealed and by Appeals Council Order dated July 8, 2005, the case was set for a new hearing on December 21, 2005. That claim ended in a denial of benefits dated May 22, 2006. Because Plaintiff's application and January 10, 2003, denial was not appealed the relevant time period in her current claim is January 11, 2003, to the present (R. 16-25). The Appeals Council denied the Request for Review on September 12, 2006 (R. 8).

B.     **Background Facts**

    1.     ***Plaintiff's December 2005 Hearing Testimony and Statements***

Plaintiff was 50 years old at the time of the ALJ's decision and has a high school diploma, a couple years of college education, and a variety of relevant work experience (R. 95, 103, 568-9). Plaintiff testified that she possesses a valid driver's license, but must wear glasses while driving (R. 569).

Plaintiff had a plate inserted in her right hand in 1992 to address an injury she suffered in 1981, and as a result cannot bend her right wrist and suffers from arthritis (R. 570 and 584).

Plaintiff's left hand is impaired by carpal tunnel syndrome, but cannot be treated surgically due to a heart condition. Plaintiff has splints for both hands, and wears them in the winter when carrying heavy items.

Plaintiff has trouble with buttons and zippers, and uses lighter half gallon cartons of milk

---

[1]Plaintiff had earlier applied for both Title II and Title XVI benefits in January 2001 (R. 46 - 50). These claims were denied by ALJ Lloyd Blair on January 10, 2003 (R. 45).

(R. 572).  Ten pounds is the maximum amount that Plaintiff can lift and carry (R. 577).

Plaintiff takes nitro pills for her heart when she has "problems," and has taken three since May 2005 (R. 572).

Plaintiff suffers from "unbearable" pelvic pain, and while doctors have never addressed this problem, Plaintiff has been told that she has hip bursitis (R. 570 and 584).  She was suffering from back pain during the ALJ's hearing (R. 574).  This pain is in the lower center, left portion of her back. and is constant.  She has only taken one of her proscribed Tylenol II because she doesn't understand this medication.

Plaintiff has diabetes which is not under control.  Plaintiff is not able to consume fresh vegetables or cook as much as she would like (R. 573).

To address her plantar fascitis, shoe inserts have been ordered (R. 573-74).  Plaintiff can walk five blocks in the summer, but only walks to the bus stop in the winter .  Plaintiff can stand for up to two hours (R. 575).  Plaintiff sits sideways to minimize back and tailbone pain, and can sit in one position for 20 - 60 minutes depending upon the position.

Plaintiff expressed concerns that symptoms of her hepatitis C have not been treated. Plaintiff has not consumed alcohol since June 2005, but prior to that, she only had one drink per month.  Plaintiff is a social marijuana smoker using it approximately six times a year (R. 579). Plaintiff used crack cocaine in 1988 for six months, but stopped (R. 579).  Plaintiff was bothered by the June 2000 report from the Family Practice Center of Psychotherapy detailing her cocaine usage because she believe that this report has labeled her as "a crack head ever since."

Plaintiff has been treated for depression since 2001, and currently takes Wellbutrin (R. 580 and 584).  Plaintiff has problems with sleep including headaches at night, waking up

frequently, and having her days and nights "mixed up" (R. 580-81). Plaintiff takes Darvocet which has been a "consistent pain medication" (R. 583).

Plaintiff washes her hands frequently, and was told that this was an obsessive compulsive disorder (R. 581). Plaintiff believes she washes her hands frequently because of her hepatitis C and the fact that she cooks for her son.

Plaintiff has occasional spurts of energy, but most days remains reclined in her bed as sitting up is "uncomfortable" (R. 582). When her son is home Plaintiff tries to spend time with him. Plaintiff suffers from "memory confusion" regarding dates and times for appointments (R. 583).

Plaintiff's current income comes from child support and state disability assistance (R. 586). She receives $299 monthly from child support and $264 in state disability payments.

## 2. *Medical Evidence*

On July 1, 2000, Plaintiff as a restrained passenger was hit by a speeding police car (R.155).

On August 31, 2000, M.N. Sabbagh, M.D., examined Plaintiff and found that there is no electrodiagnostic evidence of mononeuropathy, polyneuropathy, plexopathy or radiculopathy affecting the left or right lower extremity (R.154).

On November 20, 2000, Mark C. Watts, M.D., examined Plaintiff and noted that Plaintiff's emotional state prevented him from determining whether Plaintiff has any injuries (R. 153).

On November 20, 2001, Nancy R. Barbas, M.D., at the University of Michigan's Neurology Department, examined the Plaintiff (R. 231). She had a normal EMG and only mild

disk protrusion at the L4-5 level which Dr. Barbas considered "an insignificant finding." She believed that Plaintiff's symptoms are related to musculoskeletal strain or soft tissue stress. Dr. Barbas told Plaintiff that her prognosis was "very good" and that the appropriate treatment would be nonsteroidal anti-inflammatory medicine. On December 22, 2000, Afeworki Kidane, D.O., noted that Plaintiff had a normal EMG and a MRI which revealed only mild disc protrusion at L4-5 (R. 162). After Plaintiff disagreed with the findings of her first neurologist, a second neurologist concluded that Plaintiff "has an essentially normal neurological examination." Dr. Kidane had prescribed 8 weeks of physical therapy (R. 163).

On December 16, 2001, Subhash C. Gupta, M.D., of the Sparrow Regional Pain Management Center, examined Plaintiff and noted that while in no acute distress, she was tender at multiple places, chiefly in the lower back (R. 183). Dr. Gupta's assessment was chronic pain syndrome with multiple areas of pain with the lower back and lumbar spondylosis being the most severe.

On April 11, 2002, Plaintiff underwent psychological testing with Mary Stelma, Ph.D., and scored a "41" on the Beck Depression Inventory which is in the "severe" range (R. 259). Plaintiff indicated that she is "very interested in physical therapy." She was directed to undergo physical therapy, but records from Sparrow Outpatient Rehabilitation note that Plaintiff cancelled all her physical therapy sessions on account of her car breaking down (R. 307).

Plaintiff's underwent individual and group psychotherapy from May 2002 through September 2002 (R. 247-56). Treatment notes reflect that Plaintiff was an active participant in therapy and that she was "very attentive" and supportive of others during group therapy (R. 250, 252). Plaintiff reported some concentration and sleep problems, but noted that she was doing

things for enjoyment like cooking, baking, and fishing (R. 247-49, 251).  After a drug screen revealed marijuana in her system, Plaintiff began a 12-week substance abuse program in February 2002 (R. 264).

On May 21, 2002, Plaintiff attended group psychotherapy and testing at Sparrow Regional Pain Management Center where she was involved and spoke about factors contributing to her depression and grief (R. 250).

On June 13, 2002, Justus J. Fiechtner, M.D., examined Plaintiff and noted that Plaintiff had back pain with radiculopathy which could be treated with Vioxx, Flexeril and Acetaminophen (R. 298).  Plaintiff had a positive rheumatoid factor due to her hepatitis C, but her liver function test was within normal limits.  Dr. Fiechtner noted the presence of carpal tunnel syndrome.

On August 14, 2002, Plaintiff had a full psychotherapy session with Dr. Stelma in which Dr. Stelma noted that she still remains depressed and continued to have problems with her short term memory (R. 248).

On May 20, 2003, H.D. Jones, M.D., examined Plaintiff, and found mild atrophy of Plaintiff's right wrist (R. 317-20).  There was no functional range of motion of the right wrist.  Plaintiff could perform a heel and toe tandem gait, get on and off the examination bed without difficulty, and, while slow, her gait was not antalgic.  Dr. Jones noted a history of dental problems, status post injury and fusion of an "essentially immobile right wrist" – with normal finger-to-finger apposition.  She also had a history of carpal tunnel syndrome, hepatitis C, and a polysubstance abuse.

On June 28, 2003, Plaintiff underwent a consultative psychological examination by Jalal

Ahmed, M.D., who noted that Plaintiff was distraught and displayed poor eye contact and reported depression since her 2000 auto accident (R. 335). Plaintiff exhibited low self esteem, a depressed mood, and a restricted affect but she denied suicidal ideation (R. 336). Memory testing was unremarkable. Dr. Ahmed diagnosed Plaintiff with an adjustment disorder and assigned her a global assessment of functioning ("GAF") score of 60 (R. 337).[2] In July 2003, a state agency psychologist reviewed the record and opined that Plaintiff

did not have any "severe" mental impairments significantly impacting her ability to perform basic work-related activities (R. 338-51). Plaintiff underwent a mental health examination with social worker Debra Somervill, on September 9, 2003 (R. 523-26). Plaintiff reported that she was sexually active and exhibited a broad affect, a resentful, sad mood, and slightly impaired attention and concentration (R. 524). Plaintiff's thoughts were goal directed and clear. Memory testing was unremarkable. Plaintiff reported using alcohol weekly and marijuana monthly. Ms. Somervill diagnosed Plaintiff with anxiety and depression but did not render an opinion as to Plaintiff's functional limitations (R. 526).

On February 25, 2004, Plaintiff was examined by Dr. Aruna Kundi, M.D., for an evaluation of her chronic hepatitis C. Dr. Kundi suggested that Plaintiff should be vaccinated for hepatitis A and B and abstain from all alcohol (R. 393). Dr. Kundi requested to see Plaintiff

---

[2] The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). See id. at 32. A GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." Id. A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." Id. A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. Id.

again determine if a liver biopsy should be conducted. Dr. Kundi's notes that patient refused the vaccination.

On August 5, 2004, X-rays taken at Michigan State University's Clinical Center showed no acute fracture or dislocation of the feet (R. 455). The amount of degenerative change appeared minimal, but both feet appeared flattened with lack of a good arch.

The record does not appear to contain any mental health records for 2004 or most of 2005. In October 2005, Plaintiff underwent an assessment with a physician and therapist (R. 502-06). Plaintiff was agreeable and exhibited a normal appearance, normal motor activity and speech, normal orientation and intellect, and normal behavior, was diagnosed as moderately depressed, and assigned a GAF score of 55 (R. 506).

On February 28, 2005, Plaintiff was evaluated at the Ingham Regional Medical Center by Trude Rodli-Culver, P.T., who noted that Plaintiff was walking unaided with a mild limp, shoulders are level, there is mild abdominal protrusion, a left wrist brace, both feet have fallen arches, increased lumbar lordosis, patient is tender to palpation and with spring testing of L4-5, increased muscle tension was found in lumbar paraspinals but no swelling (R. 401). Rehab potential was measured as "fair," risk status was considered "medium," and the length of treatment was estimated at "four weeks" (R. 402).

On October 6, 2005, notes from McLaren Family Practice Center reported Plaintiff's long history of alcohol abuse, addiction to crack cocaine and marijuana (R. 20). Plaintiff was diagnosed with major depressive disorder, recurrent with a GAF of 55.

On December 16, 2005, Dr. Kundi, disclosed that Plaintiff had been treated for chronic back pain, liver dysfunction, obesity, glucose intolerance, osteoporosis and depression since June

2003, and he opined that the medical cause for many of Plaintiff's problems had not been determined (R. 538). Dr. Kundi referenced the determinations of Dr. Mysliwiec, Chief of Orthopedic Surgery at Michigan State University, who examined Plaintiff and diagnosed her with chronic pain syndrome with a significant level of functional overlay. Dr. Kundi also noted that Plaintiff possessed a number of somatic complaints which once caused her to appear at the office with a pillow tied to her posterior asking that she be assigned a four-prong cane and rolling walker.

On January 13, 2006, Mohamed Shakir, M.D., diagnosed Plaintiff with diabetes mellitus, hepatitis C and depression. Dr. Shakir noted that Plaintiff's impairments were stable, and stated that during an 8 hour workday she could not lift even ten pounds but could use her upper extremities for grasping, reaching, pushing, pulling and fine manipulation (R. 20).[3]

After the December 21, 2005, hearing before ALJ Ransom, Matthew P. Dickson, Ph.D., examined Plaintiff on March 6, 2006 for the Michigan Disability Determination Service (R. 549). At this examination, Plaintiff reported using crack cocaine for six months in 1988, admitted to drinking beer occasionally as well as smoking marijuana 8 times per year. While reporting difficulty getting along with others, Dr. Dickson noted that Plaintiff was generally socially appropriate during the examination, and that Plaintiff required no assistance in keeping appointments or finding locations. Plaintiff was judged to be in touch with reality (R. 21). Her speech was unimpaired and her stream of mental activity was spontaneous and organized with no significant evidence of hallucinations, delusions, persecutions, obsessions or thoughts controlled by others. Dr. Dickson found Plaintiff's affect was appropriate to mood and she reported feeling

---

[3]ALJ Ransom noted that the claim that Plaintiff could not lift 10 pounds was not based on objective medical evidence (R. 20).

"very good" and that she and her son were "happy." Dr. Dickson diagnosed anxiety disorder, depressive disorder, and history of cocaine and alcohol abuse with a GAF of 53 (R. 552). Assessing Plaintiff's ability to perform work-related activities, due to mental impairments, Dr. Dickson noted slight limitations in ability to understand, remember and carry out detailed instructions, make decisions on simple work-related matters and no limitations in ability to understand, remember and carry out short, simple instructions (R. 557). She had moderate limitations to interact appropriately with the public, supervisors and fellow workers or to respond to work pressures or changes (R. 558).

### b. *Vocational Evidence*

Ann Tremblay, a vocational expert ("VE") testified at Plaintiff's December 21, 2005, hearing stating that she was present for Plaintiff's testimony and had reviewed the exhibits (R. 587). ALJ Ransom asked VE Tremblay a hypothetical question assuming an individual with the same characteristics as those posed by the Plaintiff, the same age, education, limitations, and impairments, could that person perform any work? VE Tremblay answered "No. Not if she found it necessary to lay down up to five hours per day."

ALJ Ransom posed a second hypothetical question asking whether there were any jobs that could be performed by an individual with Plaintiff's age, education, and work experience, who was limited to sit/stand option at will, no repetitive bending, twisting, turning, pushing, pulling, gripping, or grasping; did not require crawling, squatting, kneeling, climbing, the use of vibratory tools, or the operation of foot controls; did not require repetitive or prolonged fine dexterity; and required only limited contact with the public (R. 587-88). Such work would need to be simple, repetitive, routine, low stress work with no use of foot controls. VE Tremblay

reported that there would be a few available jobs in the light, unskilled category, identifying only two categories of work that met the criteria listed by ALJ Ransom: approximately 6,000 machine operator jobs and 4,700 inspector jobs.

On cross examination, VE Tremblay noted that any person performing such work would need to be able to perform work six to seven hours a day "except during lunch and break times." VE Tremblay further testified on cross examination that the jobs she had identified required "minimal" contact with co-workers (R. 589).

###    c.    ALJ Ransom's Decision

ALJ Ransom noted that Plaintiff's prior complaints of disability had been denied by ALJ Blair on January 10, 2003, and that there is no basis to reopen that decision. Accordingly, the January 10, 2003, decision is the final decision of the Commissioner through that time period. Thus, the relevant period under consideration is the period starting on January 11, 2003.

ALJ Ransom determined that Plaintiff meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through December 31, 2005 (R. 24). Further, Plaintiff has not engaged in substantial gainful activity since the alleged onset of disability.

ALJ Ransom found that Plaintiff's plantar fasciitis, degenerative disc disease, hepatitis C, status post wrist fusion, ployarthralgias, diabetes mellitus, peripheral neuropathy, left carpal tunnel syndrome and adjustment, depressive, anxiety, personality and polysubstance addictions disorders are considered "severe" based on the requirements in the Regulations 20 C.F.R. §§ 404.1520(c) and 416.920(c), but they do not meet or medically equal, either singly or in combination, one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (R. 18).

While not finding claimant's allegations "totally credible," ALJ Ransom found that Plaintiff could not perform her prior work as a home health care worker, child care worker, cafeteria attendant or parking lot attendant, the last job being the one ALJ Blair found Plaintiff could perform (R. 23, 44). ALJ Ransom did determine that Plaintiff could perform simple, repetitive, routine, low stress, unskilled light work that: allowed her to alternate as needed between sitting and standing; did not require repetitive bending, twisting, pushing, pulling, gripping, or grasping; did not require crawling, squatting, kneeling, climbing, the use of vibratory tools, or the operation of foot controls; did not require repetitive or prolonged fine dexterity; and required only limited contact with the public and co-workers (R. 24).

Regarding the Plaintiff, ALJ Ransom found that she is an "individual approaching advanced age" who while possessing "more than a high school education" has "no transferable skills from any past relevant work" (R. 25). Finally, ALJ Ransom found that Plaintiff has a residual functional capacity to perform a significant range of light work as held by the VE and as such Plaintiff was not under a "disability."

## II.   ANALYSIS

### A.   Standards of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting*

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[4]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

### B.      Factual Analysis

In her Motion for Remand, Plaintiff argues that her case should be remanded for two reasons: (1) the ALJ, after rating her mental illnesses as severe, failed to perform the necessary psychological review techniques required by 20 C.F.R. §404.1520a, and (2) the ALJ violated the Commissioner's regulation in failing to proffer a post-hearing psychological examination (Dkt. # 9, pages 3 & 5).

### 1. Rating Plaintiff's Mental Illness:

Plaintiff argues that ALJ Ransom failed to properly consider her mental impairments as

---

[4] *See, e.g.*, *Varley v.  Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir.  1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v.  Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir.  1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir.  1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinburger*, 514 F.2d 293, 294 (6th Cir.  1975); *Noe v.  Weinberger*, 512 F.2d 588, 596 (6th Cir.  1975).

part of her disability (R. 21). ALJ Ransom found plaintiff had severe psychiatric impairments in four areas related to "adjustment, depressi[on], personality [,] and polysubstance addiction disorders" (R. 24).

20 C.F.R. §404.1520a requires that the ALJ follow a special technique when assessing the severity of mental impairments. Specifically, the ALJ must evaluate the degree of functional loss – using the five-point scale: none, mild, moderate, marked, and extreme – in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §404.1520a(c)(3). The ALJ must take into account:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

SSR 85-16.

20 C.F.R. §§404.1520a(c)(1) requires consideration of "all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment". In addition, 20 C.F.R. § 404.1520a(c)(2) requires that the decision maker consider the extent to which the mental impairment interferes with an "ability to function independently, appropriately, effectively, and on a sustained basis" including "such factors as the quality and level of [ ] overall functional performance, any episodic limitations [and] the amount of supervision or assistance [ ] require[d]."

Much of this analysis was commonly one in a Psychiatric Review Technique Form

("PRTF"). Prior to October 2000, the PRTF was completed at the state agency level and a form was completed by the ALJ and attached to the decision. SSA revised its regulation in September 2000 and modified 20 C.F.R. §404.1520a(e)(2) to no longer require the ALJ to complete and attach a Psychiatric Review Technique Form (" PRTF"). But in place of this the ALJ now must document the application of this §404.1520a(c) technique on the four functional areas in the written decision.

> [T]he written decision issued by the administrative law judge or Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). *The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.*")

*Id.* at § 404.1520a(e)(2) (Emphasis Supplied) .

In his decision, ALJ Ransom discussed Plaintiff's mental health history in great detail and with care and precision (R. 20-21). ALJ Ransom notes Plaintiff's performance of certain daily activities, but he failed to make specific findings as required in each of the four functional areas – activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Nor did ALJ Ransom include Plaintiff's psychological problems in his hypothetical question to VE Tremblay, although he did place certain job restrictions into this hypothetical to accommodate certain of Plaintiff's psychological limitations.[5]

In another context, the Sixth Circuit has been unforgiving when the ALJ ignores a

---

[5] The attorney for the Plaintiff on cross examination of the VE did address Plaintiff's need for limited contact with co-workers and VE Tremblay noted that these requirements would not alter the number of jobs available in her response to ALJ Ransom's hypothetical (R. 589).

Commissioner's regulation that was drafted as a procedural safeguard for a claimant. **Wilson v.**

**Commissioner of Social Security**, 378 F.3d 541 (6th Cir. 2004):

> It is an elemental principle of administrative law that agencies are bound to follow their own regulations. As the Ninth Circuit well summarized in applying this principle:
>
>> 'The Supreme Court has long recognized that a federal agency is obliged to abide by the regulations it promulgates. *See Vitarelli v. Seaton,* 359 U.S. 535, 545, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Service v. Dulles,* 354 U.S. 363, 372, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Accardi v. Shaughnessy,* 347 U.S. 260, 267, 74 S.Ct. 499, 98 L.Ed. 681 (1954). An agency's failure to follow its own regulations "tends to cause unjust discrimination and deny adequate notice" and consequently may result in a violation of an individual's constitutional right to due process. Where a prescribed procedure is intended to protect the interests of a party before the agency, "even though generous beyond the requirements that bind such agency, that procedure must be scrupulously observed." *Vitarelli,* 359 U.S. at 547, 79 S.Ct. 968 (Frankfurter, J., concurring); *see also* Note, *Violations by Agencies of Their Own Regulations,* 87 Harv. L.Rev. 629, 630 (1974) (observing that agency violations of regulations promulgated to provide parties with procedural safeguards generally have been invalidated by courts).' *Sameena, Inc. v. United States Air Force*, 147 F.3d 1148, 1153 (9th Cir.1998) (parallel citations and circuit court citations omitted).

*Wilson,* 378 F.3d at454.

*Wilson* remanded the denial of Social Security benefits because of an ALJ's failure to

follow the regulation and suggested this was the general rule to follow where the regulation

involved constitutes "an important procedural safeguard for claimants for disability benefits."

Thus, it cannot be argued that this procedural error is harmless.[6] 20 C.F.R.

---

[6] *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005) (citing *Clifton v. Chater,* 79 F.3d 1007, 1009 (10th Cir.1996)) ("But *Clifton* did not categorically reject the application of harmless error analysis in the present context. To be sure, we apply harmless error analysis cautiously in the administrative review setting. But as we explained in *Allen v. Barnhart,* 357 F.3d 1140, 1145 (10th Cir.2004), harmless error analysis 'nevertheless may be appropriate to supply a missing dispositive finding ... where, based on material the ALJ did at least consider (just not properly), we

§404.1520a(e)(2).  The techniques set out in  §404.1520a(c) are "important procedural

safeguard[s] for claimants for disability benefits."   In addition to noting that a federal agency is

obliged to abide by the regulations it promulgates, *Wilson*  added:

> a court cannot excuse the denial of a mandatory procedural protection simply
> because . . . there is sufficient evidence in the record [to uphold the ALJ decision]
> and, thus, a different outcome on remand is unlikely.  '[A] procedural error is not
> made harmless simply because [the aggrieved party] appears to have had little
> chance of success on the merits anyway.' *Mazaleski v. Treusdell,* 562 F.2d 701,
> 719 n. 41[(D.C. Cir 1977)]; *see also Ingalls Shipbuilding, Inc. v. Dir., Office of
> Workers' Comp. Programs,* 102 F.3d 1385, 1390 (5th Cir.1996). To hold
> otherwise, and to recognize substantial evidence as a defense to non-compliance
> with [the regulation], would afford the Commissioner the ability the violate the
> regulation with impunity and render the protections promised therein illusory.
> The general administrative law rule, after all, is for a reviewing court, in addition
> to whatever substantive factual or legal review is appropriate, to 'set aside agency
> action ... found to be ... without observance of procedure required by law.'
> Administrative Procedure Act, 5 U.S.C. § 706(2)(D) (2001).[7]

*Id.* at 546.

It cannot be said that no reasonable administrative fact finder, following the correct

procedures 20 C.F.R. §404.1520a(e)(2) and the technique set out in  §404.1520a(c), could have

---

could confidently say that no reasonable administrative factfinder, following the correct analysis, could have
resolved the factual matter in any other way.' ”).

In *Fischer-Ross*, the ALJ's failure to provide more than summary conclusion that social security disability
claimant did not meet the criteria of any listed impairment, at step three of the disability analysis, was harmless error
because the ALJ's findings at other steps of the sequential process may provide a proper basis for upholding a step
three conclusion that a claimant's impairments do not meet or equal any listed impairment.

*Neal ex rel. Walker v. Barnhart*, 405 F.3d 685, 689 (8th Cir. 2005) (“Harmless error analysis may be
appropriate to supply a missing dispositive finding in a social security disability proceeding, where, based on
material the ALJ considered, the court can confidently say that no reasonable administrative factfinder, following the
correct analysis, could have resolved the factual matter in any other way.”)

[7]  *Wilson*, 378 F.3d at 549 states that “We need not decide whether Social Security Rulings are binding on the
Commissioner in the same way as Social Security Regulations”, but then suggests its answer in a footnote:
“According to a regulation, Social Security Rulings ‘represent precedent final opinions and orders and statements of
policy and interpretations’ adopted by the Social Security Administration and ‘are binding on all components of the
Social Security Administration.’ 20 C.F.R. §402.35(b)(1) (2004); *see also Sykes v. Apfel,* 228 F.3d 259, 271 (3d Cir.
2000).”

resolved the factual matter in any way other than that decided by ALJ Ransom. Indeed, when there are finding of moderate limitations of concentration, persistence, or pace, these generally should be included in a hypothetical question and adding various job restrictions on limited contact, or simple, low stress jobs, etc. are insufficient.[8] In the present case, without proper findings on the four factors, specifically on any limitations on concentration, persistence or pace, it is unclear the extent to which any quota or production line repetitive tasks in the machine operator and inspector jobs used by ALJ Ransom might be affected by Plaintiff's psychological limitations. Thus, it cannot be said the errors under 20 C.F.R. §404.1520a(e)(2) and the technique set out in §404.1520a(c) were harmless.

## 2. Rating Plaintiff's Mental Illness:

Plaintiff also argues that ALJ Ransom violated the Commissioner's Regulations in failing to proffer a post-hearing examination (Dkt. # 9, p. 5). Following the December 21, 2005, hearing before ALJ Ransom, Plaintiff was sent to Dr. Dickson for a post-hearing examination on

---

[8] *Walker v Barnhart*, 258 F.Supp.2d 293 (E.D. Mich. 2003), (holding that the ALJ's hypothetical question to the VE that the claimant could perform only simple, unskilled work did not necessarily take into account the non-exertional limitations imposed by Plaintiff's depressive disorder). *See also*, *Newton v. Chater*, 92 F.3d 688 (8th Cir. 1996)(holding that a reference merely to "unskilled sedentary work" in a hypothetical question is insufficient to describe and accommodate concentration deficiencies); *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004), (holding that the ALJ had included the following limitations in the hypothetical: "no more than simple one or two-step tasks; no travel outside the workplace; and a reasonable opportunity to receive and make personal telephone calls," which the Court felt failed to "take into account the ALJ's own observation (both in her opinion and in the PRTF) that [claimant] often suffered from deficiencies in concentration, persistence, or pace."); *McGuire v. Apfel*, 1999 WL 426035, at *15 (D. Ore. 1999), (holding that "simple work" was insufficient to describe claimant's deficiencies in concentration, persistence or pace resulting in failure to complete tasks in a timely manner). *Keyser v. Barnhart,* No. 03-60078 (E.D. Mich., Sept. 2, 2004) (unpublished), held that a hypothetical question of "unskilled jobs with a low stress level alone" is not sufficient to accommodate a claimant who, under the Commissioner's new regulations, has "moderate limitations with respect to concentration, persistence or pace."); *Bielat v. Comm'r of Soc. Sec.*, No. 02-70791 (E.D. Mich. Apr. 4, 2003) (quoting *Andrews v. Comm'r of Soc. Sec.*, No. 00-75522 (E.D. Mich. Dec. 18, 2001) and citing *Thomczek v. Chater*, 1996 WL 426247 (E.D. Mich. 1996), to hold that a hypothetical question including "unskilled sedentary work" plus the limitation of "jobs low at the emotional stress level" is not sufficient to accommodate a finding of a "marked" limitation in ability to concentrate or persist at tasks.).

March 6, 2006 (R. 20-21).  Plaintiff's attorney claims to have never received the examination results, and only learned of the results upon receiving the Notice of the Unfavorable Decision dated May 22, 2006.

The Social Security Administration's hearing and litigation appeals ("HALLEX") manual states that the ALJ must proffer all post-hearing evidence unless: "(1) The evidence was submitted by the claimant or the claimant's representative and there is no other claimant to the hearing.  (2) The claimant has knowingly waived his or her right to examine the evidence. (3) The ALJ proposes to issue a fully favorable decision."

HALLEX I-2-7-30 (http://www.ssa.gov/OP_Home/hallex/I-02/I-2-7-30.html, last visited on October 8, 2007).

None of these three criteria have been met, and as a result the Regulations required that ALJ Ransom provide Plaintiff and her counsel with the opportunity to review post-hearing evaluation.  No such opportunity was provided.

The HALLEX provides guidelines regarding what must be included in any proffer letter.  Specifically, the HALLEX states that the letter must:

> "Give the claimant a time limit to object to, comment on or refute the evidence, submit a written statement as to the facts and law that the claimant believes apply to the case in light of the evidence submitted, submit written questions to be sent to the author(s) of the proffered evidence or exercise his or her rights with respect to requesting a supplemental hearing and the opportunity to cross-examine the author(s) of any post-hearing report(s) if it is determined by the ALJ that such questioning is needed to inquire fully into the issues.  Advise the claimant that he/she may request a subpoena to require the attendance of witnesses or the submission of records and the procedures for the requesting and issuance of a subpoena."

*Id.*

Further, the HALLEX details how such a letter should be delivered to a client who has

legal representation:

> If a claimant is represented, the proffer letter must be prepared for the
> representative and two copies are to be made. The letter is to be distributed as
> follows: (1) Send the original proffer letter and a copy of the new evidence to the
> representative. (2) Send a copy of the proffer letter to the claimant. (3) Enter into
> the record a copy of the proffer letter, a copy of the new evidence, and any
> comments received from the claimant and representative regarding the new
> evidence.

*Id.*

ALJ Ransom stated on the record that he intended to share the results of Plaintiff's post-hearing evaluation with Plaintiff's counsel, and it is assumed that any failure to do so was inadvertent (R. 589)[9].

Plaintiff, and more specifically her counsel, were deprived of the opportunity to analyze the findings, comment upon them, request a supplemental hearing or question the authors of the post-hearing evaluation as is required by the Social Security Administration's Regulations regarding post-hearing evaluations. For these reasons, it is recommended that upon remand, Plaintiff's counsel may review and respond to this examination consistent with the Regulations prior to any final decision is made by ALJ Ransom.

## III. RECOMMENDATION

For the reasons stated above, **IT IS RECOMMENDED** that the Commissioner's motion for summary judgement be **DENIED** and Plaintiff's motion for summary judgment be **GRANTED IN PART** and this matter be remanded for further proceedings so the ALJ can incorporate the findings required by 20 C.F.R. §404.1520a into his opinion and that Plaintiff's counsel be given an opportunity to comment on and submit and counter evidence regarding the post-hearing

---

[9] Regarding the post-hearing evaluation, ALJ Ransom stated, "They'll do an evaluation. They'll submit a report to me. I'll share it with Mr. Seward and then I will use that making my – helping me make my Decision once I receive that report." (R. 589).

psychiatric examination of March 6, 2006, prior to any final ALJ decision .

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.

Note: any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than ten days after service an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.


DATED: November 5, 2007                s/ Steven D. Pepe
                                       STEVEN D. PEPE
                                       United States Magistrate Judge

CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2007 , I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification to the following: James A. Brunson, Lewis M. Seward, Commissioner of Social Security, and I hereby certify that I have mailed by U.S. mail the paper to the following non-ECF participants: Social Security Administration - Office of the Regional Counsel, 200 W. Adams, 30th. Floor, Chicago, IL 60606

s/ James P. Peltier
James P. Peltier
Courtroom Deputy Clerk
United States District Court
600 Church St.
Flint, MI 48502
810-341-7850
pete__peltier@mied.uscourts.gov